UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

BLANCA I. DAVILA,                                    **MEMORANDUM & ORDER**

          Plaintiff,                                 16-CV-4774 (KAM)

     -against-

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

-------------------------------------X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. § 405(g), plaintiff Blanca I.

Davila ("plaintiff"), appeals the final decision of the

Commissioner of Social Security ("defendant" or the

"Commissioner"), denying plaintiff's application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security

Act (the "Act"), 42 U.S.C. §§ 301 *et seq.*, on the grounds that

plaintiff was not disabled within the meaning of the Act at any

time through December 31, 2011, the date last insured.

          On appeal, plaintiff asserts that the determination

that she was not disabled is not supported by substantial

evidence and suffers from numerous legal errors.  (ECF No. 28,

Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl.

Mem." or "plaintiff's memorandum"), at 3.)

          Presently before the court are defendant's motion for

judgment on the pleadings (ECF No. 26) and defendant's

memorandum of law (ECF No. 27; "Def. Mem.") and reply memorandum in support thereof. (ECF No. 29; "Def. Repl.") Also before the court are plaintiff's memorandum, the parties' Joint Statement of Non-Medical Facts (ECF No. 37-1, "JT Non-Med."), Joint Stipulation of Medical Facts (ECF No. 37-2, "JT Med."), and Plaintiff's Supplement to the Joint Stipulation of Medical Facts. (ECF No. 38-1, "Pl. Supp.".)

For the reasons set forth below, the court denies the Commissioner's motion for judgment on the pleadings, and grants plaintiff's cross-motion to the extent that the court vacates the Commissioner's decision and remands this matter for further proceedings consistent with this Memorandum and Order.

## BACKGROUND AND PROCEDURAL HISTORY

The court adopts the factual and procedural background set forth in the Administrative Transcript;[1] the Administrative Law Judge's October 15, 2014 decision (the "2014 ALJ Decision," Tr. 9-33); the parties' Joint Statement of Non-Medical Facts and Joint Stipulation of Medical Facts; Plaintiff's Supplement to the Joint Stipulation of Medical Facts; and the parties' respective motions for judgment on the pleadings. This Memorandum and Order discusses only those facts relevant to the court's determination as set forth herein.

---

[1]     Citations to the administrative record are indicated by the abbreviation "Tr."

This action arises from plaintiff's second application for DIB under Title II of the Act. Plaintiff filed her first application on March 3, 2006, which resulted in a determination by an administrative law judge that plaintiff was not disabled, as set forth in a written decision dated December 30, 2008 (the "2008 ALJ Decision"). (Tr. 206-21.) Plaintiff did not appeal or otherwise request review of the 2008 ALJ Decision, and the 2008 ALJ Decision therefore became final and administrative *res judicata* applies to her March 3, 2006 claim. (Def. Mem. at 1; Pl. Mem. at 4 n.1; *see also Navan v. Astrue*, 303 F. App'x 18, 20 (2d Cir. 2008) ("Administrative *res judicata* is appropriately applied where a prior determination on the same facts and issues made by the Commissioner has become final by either administrative or judicial action." (citing 20 C.F.R. § 404.957(c)(1))).)

On February 14, 2011, plaintiff filed the instant application for DIB under Title II of the Act. (Tr. 225.) Plaintiff initially alleged a disability onset date of January 27, 2006 (*id*.), but in light of the 2008 ALJ Decision and its *res judicata* effect, plaintiff subsequently amended her alleged onset date to December 31, 2008. (Pl. Mem. at 4 n.1; *see also* Tr. 145 (portion of ALJ hearing transcript discussing amendment of onset date to date after the 2008 ALJ Decision).)

In the instant DIB application, plaintiff alleges disability due to bipolar manic depression, carpal tunnel syndrome in both hands, sciatica, and loss of hearing in the right ear. (Tr. 182.) The Social Security Administration ("SSA") found plaintiff "[n]ot [d]isabled" within the meaning of the Act, and consequently denied her application on May 3, 2011. (Tr. 181-91.) Plaintiff sought reconsideration of the SSA's determination, and on June 22, 2011, the SSA again found plaintiff "[n]ot [d]isabled" and concluded that "the total evidence of record [wa]s sufficient and consistent to support the proposed determination." (Tr. 192-203.)

On August 19, 2011, plaintiff requested an administrative hearing before an administrative law judge. (Tr. 262-63.) She appeared at the hearing on September 5, 2012, represented by her attorney, Jose Alonso, Esq., and testified before Administrative Law Judge Gregory J. Froehlich (the "ALJ"). (Tr. 225; *see also* Tr. 141-71 (consisting of September 2012 hearing transcript).) A vocational expert identified as "Mr. Capps"[2] also appeared and testified at the hearing. (Tr. 162-70.) On December 21, 2012, the ALJ Froehlich issued a decision (the "2012 ALJ Decision") in which the ALJ found plaintiff not disabled and consequently denied her DIB claim.

---

[2]    The transcript of the hearing does not state Mr. Capps's first name. (*See* Tr. 141, 162.)

(Tr. 222-42.)  In denying plaintiff's claim, the ALJ concluded that plaintiff had the residual functional capacity to form less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and could not perform her past relevant work (Tr. 227-36), but that there were nevertheless jobs that existed in significant numbers in the national economy that plaintiff could perform.  (Tr. 236-37.)

Plaintiff appealed the 2012 ALJ Decision to the Appeals Council on January 7, 2013.  (Tr. 318-21.)  On November 29, 2013, the Appeals Council granted review, vacated the 2012 ALJ Decision, and remanded the case with specific instructions to the ALJ regarding his evaluation of plaintiff's carpal tunnel syndrome and potentially resulting manipulative limitations, hepatitis C, obesity, and RFC, and his consideration of a third-party functional report completed by plaintiff's spouse.  (Tr. 243-47.)

On August 11, 2014, the ALJ held a second hearing. (Tr. 12; *see also* Tr. 101-40 (consisting of transcript of August 11, 2014 hearing).)  Plaintiff, again represented by Mr. Alonso, appeared and testified at the hearing.  (Tr. 12, 102-04.)  Mr. Paul R. Dolan, a vocational expert ("VE Dolan"),[3] also appeared

---

[3]     The hearing transcript misspells VE Dolan's last name as "Dohan."  (*See*, *e.g.*, Tr. 102.)  This memorandum and order uses the correct spelling, as set forth in VE Dolan's résumé.  (Tr. 326.)

and testified. (Tr. 12, 102; *see also* Tr. 128-39 (consisting of transcript of VE Dolan's testimony).)

The ALJ issued the 2014 ALJ Decision on October 15, 2014. (*See generally* Tr. 9-33.) In the 2014 ALJ Decision the ALJ concluded that plaintiff "was not under a disability within the meaning of the Act from December 31, 2008," *i.e.*, the amended alleged onset date, "through the date last insured," *i.e.*, December 31, 2011. (Tr. 12-13.)

Plaintiff sought review of the 2014 ALJ Decision on December 17, 2014. (Tr. 5-8.) On March 24, 2016, the Appeals Council denied plaintiff's request for review, making the 2014 ALJ Decision the final decision of the Commissioner. (Tr. 1-4.)

Plaintiff commenced the instant appeal on August 23, 2016. (*See generally* ECF No. 1, Complaint.) The relevant period in review for a disability determination as to plaintiff is from December 31, 2008, the amended alleged onset date, through December 31, 2011, the date last insured. The parties each moved for judgment on the pleadings and filed their motion papers on August 30, 2017. (*See generally* Def. Mem.; Pl. Mem.; Def. Repl.) Additionally, the parties filed joint stipulations and plaintiff filed a supplemental statement, in each case regarding plaintiff's medical and non-medical history, in February of 2018, at which point the parties' cross-motions

became ripe for adjudication.  (*See generally* JT Non-Med.; JT Med.; Pl. Supp.)

**DISCUSSION**

**I.   Standard of Review**

   **A. The Substantial Evidence Standard**

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.").  Accordingly, the reviewing court does not conduct a *de novo* review, and may not "substitute [its] own judgment" for that of the ALJ.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citations omitted).  Instead, if there is substantial evidence in the record to support the Commissioner's factual findings,

those findings are conclusive and must be upheld. *See* 42 U.S.C. § 405(g).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and "is more than a mere scintilla." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). Importantly, "an analysis of the substantiality of evidence must also include that which detracts from its weight," and a court reviewing an ALJ's determination must therefore "consider[] the whole record, examining the evidence from both sides." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).

**B. Five-Step Disability Evaluation**

To qualify for DIB, an individual must be disabled. 42 U.S.C. § 423(a)(1)(E). An individual is disabled under the Act when he or she is not able "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment, or impairments, must be "of such severity that [the claimant] is not only unable to do his [or her] previous work but cannot, considering his [or her] age,

8

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To be eligible for DIB an individual must also have been insured within the meaning of 42 U.S.C. § 423(c)(1) at the time he or she became disabled. 42 U.S.C. § 423(a)(1)(A); *see also* 42 U.S.C. §§ 423(c)(1) and 414(a)-(b) (defining insured status).

To determine whether a claimant is disabled, the SSA follows a five-step sequential analysis, as detailed below. 20 C.F.R. §§ 404.1520(a)(4).

### 1. Step One

At step one, the Commissioner "consider[s] [the claimant's] work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is working and the claimant's work is substantial gainful activity, then his or her claim will be denied "regardless of [the claimant's] medical condition or [his or her] age, education, and work experience." 20 C.F.R. § 404.1520(b); *accord id.* If the claimant is not engaged in substantial gainful employment, the Commissioner will proceed to step two.

### 2. Step Two

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] §

404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii).

A severe impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and both physical and mental impairments "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.

Additionally, to be considered "severe," an impairment or combination of impairments must "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R § 404.1522(a). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" ability to see, hear, and speak; ability to understand, perform, and remember simple instructions; ability to use judgment; appropriate response to supervision, co-workers, and usual work situations; and ability to adjust to changes in a "routine work setting." 20 C.F.R. § 404.1522(b).

In determining whether a claimant's physical or mental impairments are of "sufficient medical severity" to "be the basis of eligibility [for benefits] under the law," the Commissioner "will consider the combined effect of all [the

claimant's] impairments without regard to whether any [particular] impairment, if considered separately, would be of sufficient severity."  20 C.F.R. §§ 404.1523(c).  In assessing severity, however, the Commissioner will not consider the claimant's age, education, or work experience.  20 C.F.R. § 404.1520(c).

When considering mental impairments, the Commissioner uses a "special technique" that examines "symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment[]" or impairments, the extent of the claimant's "functional limitations" and the "severity of [his or her] mental impairment(s)."  20 C.F.R. § 404.1520a(a)-(d).

Finally, to meet the duration requirement, an impairment must be "expected to result in death, [or] must have lasted or must be expected to last for a continuous period of at least [twelve] months."  20 C.F.R. § 404.1509.

If the Commissioner determines that the impairment is medically determinable and severe, then the Commissioner will proceed to step three.

### 3.    Step Three

At step three, the Commissioner determines whether the claimant's impairment meets or equals an impairment or impairments found in the "Listing of Impairments" contained in

appendix 1 of 20 C.F.R. part 404, subpart P and meets the
duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(iii).  If the
Commissioner determines that the claimant's impairment is
"listed" or equals a "listed" impairment, and satisfies the
duration requirement, then the Commissioner will find the
claimant to be disabled regardless of age, education, or work
experience.  20 C.F.R. § 404.1520(d).

Alternatively, if Commissioner finds that the
claimant's impairment does not meet or equal a listed impairment
at step three, the Commissioner will assess the claimant's
residual functional capacity ("RFC").[4]  20 C.F.R. §§ 404.1520(e).
A claimant's RFC is the most he or she can do in a work setting
despite the limitations imposed by his or her impairment.  20
C.F.R. §§ 404.1545(a)(1).  In determining a claimant's RFC, the
Commissioner must consider "all of the relevant medical and
other evidence" in the record, 20 C.F.R. § 404.1545(a)(3), as
well as the limiting effects of all of the claimant's
impairments, including those that are not "severe."  20 C.F.R.
§§ 404.1545(e).  The Commissioner must also assess the
claimant's mental abilities by "first assess[ing] the nature and

---

[4]      The Commissioner's RFC analysis takes place between before step four.  *See* 20
C.F.R. §§ 404.1520(a)(4) ("Before [the Commissioner] go[es] from step three to step
four, [the Commissioner] assess[es] [the claimant's] residual functional capacity.").
Regardless of whether it is discussed as part of step three, part of step four, or an
intermediate quasi-step, the RFC analysis must come after a determination that the
plaintiff has a severe impairment that does not meet or equal a listed impairment at
step three and before a determination as to whether the claimant can perform past
relevant work at step four.  *See id.; see also* 20 C.F.R. §§ 404.1520(a)(4)(iii)-(iv).

extent of [the claimant's] mental limitations and restrictions and then determin[ing] [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c).

An ALJ's failure to account for an impairment in the RFC analysis is grounds for remand. *See Schmidt v. Colvin*, No. 15-CV-2692 (MKB), 2016 WL 4435218, at *13 (E.D.N.Y. Aug. 19, 2016) ("An RFC determination must . . . 'account for limitations imposed by both severe and nonsevere impairments.'" (quoting *Parker-Grose v. Astrue*, 462 F. App'x. 16, 18 (2d Cir. 2012))). This principle applies with equal force where an ALJ fails to account for a mental impairment, whether severe or not, as part of the RFC assessment. *Id.* ("Because the ALJ failed to account for the limitations imposed by Plaintiff's non-severe mental impairments, the Court remands for consideration of those limitations in determining Plaintiff's RFC." (citing *Parker-Grose*, 462 F. App'x at 18)).

### 4. Step Four

At step four, the Commissioner must determine whether the claimant's RFC permits the claimant to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20

C.F.R. § 404.1560(b)(1).  If the claimant can perform his or her
past relevant work, the claimant is not disabled.  20 C.F.R. §
404.1520(f).  If the claimant cannot perform his or her past
relevant work, the Commissioner will move to step five.

### 5.   Step Five

In the fifth and final step of the sequential
analysis, the Commissioner determines whether the claimant can
perform "alternative occupations available in the national
economy" in light of his or her RFC and vocational factors of
age, education, and work experience.  *Dixon v. Shalala*, 54 F.3d
1019, 1022 (2d Cir. 1995) (quoting *Dixon v. Heckler*, 785 F.2d
1102, 1103 (2d Cir. 1986)); *accord* 20 C.F.R. § 1520(g)(1).  If
the claimant can transition to other work that "exist[s] in
significant numbers in the national economy," the claimant is
not disabled; if the claimant cannot transition, the
Commissioner must find the claimant disabled.  20 C.F.R. §§
404.1520(g)(1), 404.1560(c).

### 6.   Burden of Proof

The claimant must prove his or her case at steps one
through four and "has the general burden of proving that he or
she has a disability within the meaning of the Act."  *Burgess*,
537 F.3d at 128 (citation omitted).  At the fifth step, the
burden shifts to the Commissioner to show that in light of the
claimant's RFC, age, education, and work experience, he or she

14

is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1999); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). At step five, the Commissioner need not provide additional evidence about the claimant's RFC, and need only show that there is work in the national economy that the claimant can do. 20 C.F.R. § 404.1560(c)(2); *accord Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. § 404.1520(g)(1).

### C. Evidentiary Rules

#### 1. ALJ's Duty to Develop the Record

Because benefits proceedings are non-adversarial in nature, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (quoting *Tejada*, 167 F.3d at 774); *accord Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." (citation omitted)).

Consequently, the ALJ generally has a duty to seek out additional information where the record before the ALJ is inadequate. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was

15

the ALJ's duty to seek additional information from [the treating physician] *sua sponte*." (citation omitted)).  A remand for further findings may be appropriate where the ALJ does not fulfill his or her affirmative obligation to develop the record. *See Butts v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("[I]n cases where the ALJ fail[s] to develop the record sufficiently to make appropriate disability determinations, a remand for further findings that would so plainly help to assure the proper disposition of the claim is particularly appropriate." (internal quotation marks and citation omitted)).

### 2.  Medical Opinions

The Commissioner must evaluate every medical opinion in the record, "[r]egardless of its source," when determining whether an individual is disabled.  20 C.F.R. § 404.1527(c). The Commissioner will give the medical opinion of a treating source "controlling" weight if the Commissioner finds that the opinion as to the "nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Burgess,* 537 F.3d at 128 (describing the principle as the "treating physician rule" (citations omitted)); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When . . . substantial evidence in the record conflicts

with the treating physician's opinion, however, that opinion

will not be deemed controlling.").[5]

Medically acceptable clinical and laboratory

diagnostic techniques include consideration of a "patient's

report of complaints, or history, [a]s an essential diagnostic

tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.

2003) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.

1997)); *accord Burgess,* 537 F.3d at 128 (citation omitted).

Additionally, opinions from other medical sources that

are not "acceptable medical sources" under applicable

regulations are nevertheless "important and should be evaluated

on key issues such as impairment severity and functional

effects." *Anderson v. Astrue*, No. 07-CV-4969(DLI), 2009 WL

2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (quoting SSR 06–03P,

Titles II and XVI: Considering Opinions and Other Evidence from

Sources Who Are Not "Acceptable Medical Sources" in Disability

Claims, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006)).[6]

Importantly, the regulations set forth various

"factors" that ALJs must consider in determining how to weigh

---

[5]    The court notes that the SSA recently adopted regulations that change the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1520c.  Because plaintiff filed her claim before that date, the court applies the treating physician rule under 20 C.F.R. § 404.1527, and not 20 C.F.R. § 404.1520c.  *See id.*

[6]    The court notes that the SSA recently rescinded SSR 06-3P as no longer applicable to claims filed on or after March 27, 2017, and adopted new regulations for evaluating medical sources that are not "acceptable medical sources," as well as nonmedical sources, for such claims.  *See Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 82 Fed. Reg. 15263-01 (Mar. 27, 2017).  Because plaintiff's claim was filed before that date, the new regulations do not apply here.

medical opinions, including treating physician opinions. *See* 20 C.F.R. § 404.1527(c). When a treating physician's opinion is not given controlling weight, the ALJ must "comprehensively set forth his [or her] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33); *accord* 20 C.F.R. § 404.1527(c)(2). Failure to provide "good reasons" for the weight assigned to a treating physician constitutes a ground for remand. *Snell*, 177 F.3d at 133 (citation omitted); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion.").

Although applicable regulations do not exhaustively define what constitutes a "good reason" for the weight given to a treating physician's opinion, the ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. § 404.1527(c)(2)-(6). These same factors also guide evaluation of other sources' opinions. *Canales v. Comm'r of Soc. Sec.*, 698 F.

Supp. 2d, 335, 344 (E.D.N.Y. 2010) (citing SSR 06-3P, 2006 WL 2329939, at *4); *see also* 20 C.F.R. § 404.1527(c)(2)-(6).

Finally, although applicable regulations set forth several factors, one factor may be dispositive. *See Halloran*, 362 F.3d at 32-33 (concluding that ALJ properly applied substance of treating physician rule where the ALJ "considered the treating physician's opinion and explained the consistency of [the treating physician's] opinion 'with the record as a whole'" (citation omitted)).

### 3. Evaluation of Symptoms

In determining whether a claimant is disabled, the Commissioner considers all of the claimant's symptoms "and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). The Commissioner's evaluation of symptoms is a two-step process.

First, the Commissioner must determine whether "objective medical evidence from an acceptable medical source" shows that "[the claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* Second, if such an impairment exists, the commissioner must "evaluate the intensity and persistence of [the claimant's] symptoms," considering "all of the available

evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).

The Commissioner must consider whether the claimant's symptoms are consistent with objective medical evidence, but will not disregard a claimant's statements about their symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. § 404.1529(c)(2).  The Commissioner will carefully consider all information that the claimant submits about his or her symptoms, including from non-medical sources.  20 C.F.R. § 404.1529(c)(2)-(3).  Further, in reaching a conclusion, the Commissioner will "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence," including the claimant's history, laboratory findings, and "statements by [the claimant's] medical sources or other persons about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. §§ 1529(c)(4).[7]

---

[7]     The SSA recently published a Social Security Ruling ("SSR") relating to the proper evaluation of a claimant's statements about his or her symptoms.  This SSR modified prior SSA guidance as to an administrative law judge's ability to make a "credibility" determination regarding a claimant's statements.  *Compare* SSR 16-3P, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (SSA Mar. 16, 2016) *with* SSR 96-7P, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (SSA July 2, 1996). These rulings do not change the applicable regulations as set forth in the Code of Federal Regulations, and prior to the issuance of SSR 16-3P on March 16, 2016, SSR 96-7P controlled and allowed administrative law judges to assess the credibility of the claimant during the RFC determination. *See* SSR 96-7P, 1996 WL 374186, at *1-2.

## II. The 2014 ALJ Opinion

As noted above, in the 2014 ALJ Decision, the ALJ applied the five-step analysis set forth at 20 C.F.R. § 404.1520(a)(4) and concluded that plaintiff was not disabled within the meaning of the Act at any time from the alleged onset date through December 31, 2011, the date last insured.   (Tr. 12-27.)

### A. The ALJ's Analysis at Steps One through Three

At step one of the five-step analysis, the ALJ found that plaintiff had not engaged in "substantial gainful activity" since her initial alleged onset date of January 27, 2006.   (Tr. 14.)   At step two, the ALJ found that plaintiff had the following severe impairments through the date last insured: degenerative disc disease; migraines; obesity; and bipolar disorder.   (Tr. 15.)

Also at step two, the ALJ concluded that plaintiff's carpal tunnel syndrome did not result in more than minimal limitations and therefore was not severe, (Tr. 16-17), and that plaintiff's fibromyalgia and kidney failure were not medically determinable prior to the date last insured.   (Tr. 15.)   The ALJ further concluded that plaintiff had medically determinable hearing difficulties and hepatitis C, but these impairments did not result in more than minimal limitations, and thus were not severe.   (Tr. 17.)

At step three, the ALJ found that plaintiff did not
have an impairment or combination of impairments that met or
medically equaled the severity of an impairment in the Listing
of Impairments.  (Tr. 17-19.)  The ALJ specifically considered
Listing 1.04, which addresses spinal disorders, and Listing
12.02, which addresses neurocognitive disorders.  (Tr. 17-18.)
In concluding that plaintiff's impairments did not meet or
medically equal the criteria of Listing 12.02, the ALJ found
that plaintiff did not satisfy the "paragraph B" criteria, which
require that a mental impairment result in at least two
conditions specified in that paragraph.  (Tr. 18-19.)  Notably,
the ALJ observed that the "paragraph B" criteria "are not a
residual functional capacity assessment," and "[t]he mental
residual functional capacity assessment used at steps 4 and 5 of
the sequential evaluation process requires a more detailed
assessment by itemizing various functions contained in the broad
categories found in Paragraph B."  (Tr. 19.)

**B. The ALJ's RFC Analysis**

The ALJ evaluated plaintiff's RFC and concluded that
she "had the [RFC] to perform light work as defined in 20 CFR
404.1567(b) with additional restrictions" through December 31,
2011, the date last insured.  (Tr. 20.)  Regarding plaintiff's
restrictions, the ALJ concluded that

[plaintiff] is limited to work that allows her to alternate between periods of sitting and standing as frequently as every 30 minutes. [Plaintiff] can occasionally stoop, kneel, crouch, crawl, balance, and climb. [Plaintiff] must avoid concentrated exposure to vibrations, or environments involving work around mechanical parts or unprotected heights. [Plaintiff] is able to deal with changes in a routine work setting, but is limited to simple tasks with little variation and taking only a short time to learn, up to and including 30 days. Lastly, [plaintiff] is able to relate adequately to co-workers and superiors, but is limited to work that requires only occasional contact with the general public.

(*Id.*)

In reaching this determination, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, which included "severe back pain that radiates into her lower extremities," "leg numbness," pain so severe as to cause loss of consciousness at work, "severe migraines," and "severe depression." (Tr. 20-21.) However, the ALJ concluded that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 21-22.)

The ALJ noted that the 2008 ALJ Decision had *res judicata* effect through December 30, 2008. (Tr. 22.) The ALJ also concluded that various treatment and exam records supported conclusions that plaintiff could walk and was "capable of lifting, carrying, pushing, pulling, and performing postural

activities. (*Id.* (citing Tr. 583-85, 669-74, 729).)
Additionally, the ALJ referenced diagnostic imaging results,
including a February 2012 lumbar MRI and May 2009 lumbar x-rays,
and characterized the findings as "mild" and/or "moderate."
(*Id.* (citing Tr. 626, 736-37).) The ALJ took these findings to
support a conclusion that plaintiff could perform light
exertional work. (*Id.*) Further, the ALJ wrote that a statement
in the report of the 2012 MRI that the findings were "unchanged
from 2007 and 2009 . . . supports the conclusion that
[plaintiff's] condition [wa]s not deteriorating." (*Id.* (citing
Tr. 736-37).)

As to plaintiff's mental condition, as discussed more
fully below in section III.B.2 of this Memorandum and Order, the
ALJ concluded that plaintiff was "not as impaired as alleged and
could perform simple tasks" (Tr. 23), and that plaintiff could
"perform work that requires only occasional contact with the
public" and "could maintain socially appropriate contact with
others for at least brief periods." (Tr. 23-24.) These
conclusions formed the basis for the ALJ's finding that
plaintiff was limited to simple tasks and only occasional
contact with the general public.

## C. The ALJ's Analysis at Step Four

At step four, the ALJ noted plaintiff's past work and
its relevant characteristics as set forth in the *Dictionary of*

*Occupational Titles*.  (Tr. 25.)  The ALJ then found that plaintiff "has been unable to perform her past relevant work both as performed and per the [*Dictionary of Occupational Titles*]."  (*Id.*)  Although the ALJ stated that he reached this finding "[b]ased on the vocational expert's testimony," *i.e.* the testimony of VE Dolan, the ALJ did not elaborate further.  (*Id.*)

### D. The ALJ's Analysis at Step Five

At step five, the ALJ concluded that, in light of plaintiff's age, education, work experience, and RFC, she was capable of adjusting to other work that exists in significant numbers in the national economy.  (Tr. 25-27.)  In relevant part, the 2014 ALJ Decision states that, at the August 2014 hearing, the ALJ "asked the vocational expert whether jobs existed in the national economy for an individual with [plaintiff's] age, education, work experience, and residual functional capacity."  (Tr. 26.)  In response, VE Dolan testified that "given all these factors, the [hypothetical] individual would have been able to perform" three occupations, specifically "Office Helper," "Mail Clerk," and "House Sitter." (*Id.*)

Although the 2014 ALJ Decision does not state how the ALJ characterized plaintiff's RFC to the ALJ (*see id.*), the transcript of the hearing indicates that the ALJ posed two hypotheticals to the ALJ.  First, the ALJ posited

> an individual limited to work at the light
> exertional level, 30-minute sit, stand option.
> There will be occasional postural activities;
> climb down, stoop, kneel, crouch, crawl, no
> concentrated exposure to vibrations or ground
> moving mechanical parts, work around unprotected
> heights, and the mental is what we'll basically
> kind of almost root out all the past work as the
> claimant would be limited to performing simple
> tasks with little variation taking a short period
> of time to learn and that would up to and
> including 30 days, that would relate adequately
> to coworkers and supervisors but would be limited
> to occasional general public contact and they
> would be able to deal with the changes in a
> routine work setting.

(Tr. 135.)

VE Dolan testified that such an individual would be

able to work as an office helper, mail clerk, and/or house

sitter. (Tr. 136.)

Next, the ALJ asked the vocational expert to consider

the same individual, but

> add that the individual would be expected to be
> off task during the workday for approximately 20
> percent of the workday and that would of course
> be at unpredictable intervals so that would fall
> [out]side the normally permitted breaks which I
> understand to be the two 15-minute breaks, the
> one 30-minute break, what affect would that have
> on the job consensus[?]

(Tr. 137.)

VE Dolan testified that he "d[id no]t believe" that

this second hypothetical individual "would be able to sustain

any competitive work activity." (*Id.*) The ALJ therefore took

the first, and not the second, hypothetical individual to be the

26

appropriate comparator for plaintiff, and based on VE Dolan's analysis and the ALJ's other findings at steps one through four, the ALJ found that plaintiff was "not disabled," as defined in the Act, at any time from January 27, 2006, the initial alleged onset date, through December 31, 2011, the date last insured. (Tr. 26-27.)

## III. Analysis

Plaintiff asserts that the ALJ improperly evaluated the severity of her carpal tunnel syndrome at step two of the five-step sequential analysis (Pl. Mem. at 16-21), and that even if the ALJ correctly determined that plaintiff's carpal tunnel syndrome is not severe, the ALJ erred by failing to consider her manipulative limitations as part of the RFC analysis. (*Id.* at 21-23.)[8] Additionally, plaintiff contends that the ALJ's RFC determination is flawed because the ALJ failed to consider plaintiff's migraines, and because he improperly evaluated plaintiff's mental RFC. (Pl. Mem. at 15-16, 23-28.)

### A. Carpal Tunnel Syndrome

As an initial matter, "[c]arpal tunnel syndrome is a condition that causes numbness, tingling and other symptoms in the hand and arm," and "is caused by a compressed nerve in the carpal tunnel, a narrow passageway on the palm side of [the]

---

[8]     Plaintiff does not challenge the ALJ's determination that neither her kidney disease nor her fibromyalgia were medically determinable prior to the date last insured.

wrist."  Mayo Clinic, *Carpal Tunnel Syndrome – Symptoms &
Causes*, *available at* https://www.mayoclinic.org/diseases-
conditions/carpal-tunnel-syndrome/symptoms-causes/syc-20355603
(last visited Oct. 15, 2018).  Carpal tunnel syndrome can also
cause "weakness in [the] hand," and result in a "tendency to
drop objects."  *Id.*

Plaintiff asserts that the ALJ erred in assessing the
severity of her carpal tunnel syndrome at step two as the ALJ's
determination is not supported by substantial evidence.  (Pl.
Mem. at 17.)  Plaintiff also asserts that the ALJ erred in
determining that the opinion of Dr. Badri Mehrotra, M.D. should
not be given controlling weight (*Id.* at 17-18), and that the ALJ
supported this determination by mischaracterizing and
selectively considering evidence.  (*Id.* at 18-21.)  Plaintiff
further contends that the ALJ's failure to consider her carpal
tunnel syndrome "severe" "is especially significant here because
the ALJ found that plaintiff retained the RFC to perform light
work as defined in 20 C.F.R. §[] 404.1567(b) . . . , with
exceptions" (*id.* at 21), but in making this finding, did not
address plaintiff's carpal tunnel syndrome or the resulting
manipulative limitations.  (*Id.* at 21-23.)

### 1.    **Harmless Error Rule**

Defendant argues that as a threshold matter, errors at
the second step of the sequential analysis are harmless as a

matter of law when the ALJ continues with the sequential analysis. (Def. Repl. at 4.) Some authority exists for the proposition that, under certain circumstances, an erroneous determination that an impairment is non-severe at step two could be harmless. *See Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010*)* (summary order) ("Even if we were to reach the merits of [claimant's] argument, we would not identify error warranting remand because the ALJ did identify severe impairments at step two, so that [claimant's] claim proceeded through the sequential evaluation process."); *see also Hamilton v. Colvin*, 8 F. Supp. 3d 232, 241-42 (N.D.N.Y. 2013) (collecting cases).

The common thread running through the relevant authority, however, is that the impairment determined to be non-severe was nevertheless considered fully in the RFC analysis. *See Stanton*, 370 F. App'x at 233 n.1 ("[T]he ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination."); *see also Hamilton*, 8 F. Supp. 3d at 242 (concluding error was not harmless where the ALJ decision contained "no indication . . . that the ALJ considered the impact of plaintiff's carpal tunnel syndrome on his ability to perform work-related functions" after concluding that the carpal tunnel syndrome was non-severe). Thus, "where the ALJ's step-

two error prejudiced the claimant at later steps in the sequential evaluation process, remand is required." *Southgate v. Colvin*, No. 14-CV-166, 2015 WL 6510412, at *6 (D. Vt. Oct. 28, 2015) (citing *Hamilton*, 8 F. Supp. 3d at 242).

Here, the 2014 ALJ Decision acknowledges that plaintiff was diagnosed with carpal tunnel syndrome in 1997, underwent surgery for it in 2008, and testified that her symptoms had been "coming back." (Tr. 16.) The ALJ, however, determined that plaintiff's carpal tunnel syndrome "is not as severe as alleged" (*id.*), and "does not result in more than minimal limitations." (Tr. 17.) Moreover, the ALJ did not clearly address plaintiff's carpal tunnel syndrome, or any potentially resulting manipulative limitations, in his RFC analysis. (*See* Tr. 20-25.)

Thus, unlike the cases on which defendant relies, here, the ALJ did not in any way address the relevant impairment beyond step two, and consequently, the court cannot conclude that reversible error at step two would have been harmless. The court must therefore determine whether the ALJ erred in finding plaintiff's carpal tunnel syndrome non-severe at step two, and if the ALJ did err, that error is grounds for remand.

### 2.    Reversible Error at Step Two

#### i.    *Res Judicata Effect of 2008 ALJ Decision*

In arguing that the ALJ did not commit reversible error in assessing plaintiff's carpal tunnel syndrome, defendant asserts that "the doctrine of *res judicata* precludes consideration of any medical records and treatment history before December 30, 2008," the date of the 2008 ALJ Decision. (Def. Repl. at 5.)  Notably, at step two of the five step sequential analysis in 2008, the administrative law judge determined that plaintiff's carpal tunnel syndrome was a severe impairment.  (Tr. 211.)  Defendant does not, however, contend that the 2008 step two determination is binding, only that medical records and treatment history before December 30, 2008 may not be considered here.[9]

Defendant is incorrect as to the application of *res judicata*.  Under the doctrine of administrative *res judicata*, a previous determination or decision on the "same facts and on the same issue or issues" that has become final is binding in subsequent proceedings.  *See* 20 C.F.R. § 404.957(c)(1); *accord Stellacci v. Barnhart*, No. 02-CV-8875(SAS), 2003 WL 22801554, at *5 (S.D.N.Y. Nov. 24, 2003). (citations omitted).  As applied here, *res judicata* requires only that the 2008 ALJ Decision's

---

[9]    It also bears mention that the ALJ expressly considered hospital records from 2006 as part of his step two analysis.  (Tr. 16.)

determination that plaintiff was not disabled on or before December 30, 2008 be given binding effect in this proceeding. It does not command that the ALJ or the court ignore evidence upon which that determination was based and which may be relevant to the issues presented here. *See Stellacci*, 2003 WL 22801554, at *5 (observing, in discussing administrative *res judicata*, that "[s]ome cases mandate consideration of retrospective diagnoses when there is no contemporaneous diagnosis" (citing *Basinger v. Heckler*, 725 F.2d 1166 (8th Cir. 1984))).  Accordingly, the court considers medical records and treatment history before December 30, 2008 in reviewing the 2014 ALJ Decision.

### *ii.   Substantial Evidence*

Plaintiff asserts that the ALJ's step two determination that plaintiff's carpal tunnel syndrome was not severe is not supported by substantial evidence.  (Pl. Mem. at 17.)  For the reasons set forth below, the court agrees.

### *a.   Function Reports*

At step two, the ALJ relied on function reports completed by plaintiff and her ex-husband, which the ALJ took to "support the conclusion that [plaintiff's] carpal tunnel syndrome is not as severe as alleged." (Tr. 16.)  Specifically, the ALJ noted that plaintiff's ex-husband "stated that [plaintiff] was able to prepare meals, use a computer, read, and

complete puzzles." (Tr. 16 (citing Tr. 487-94).) Additionally, the ALJ cited plaintiff's function reports from June 2011 and March 2011. In relevant part, and according to the ALJ, in the June 2011 report, plaintiff "stated she could prepare meals, perform chores, shop, and use a computer" (*id.* (citing Tr. 476-84)), and in March 2011 report, she "stated that she could cook 'complete meals' at least once per week." (*Id.* (citing Tr. 457-64).) A review of the reports indicates that the ALJ's reading of these reports was selective, and when read properly and completely, the function reports do not support the ALJ's conclusion.

Plaintiff's ex-husband's third-party function report listed plaintiff's hobbies and interests as "puzzle, reading, computer," but also stated that although plaintiff was "go[od] at" her hobbies, "she has no more interest" in them since the onset of her "illnesses, injuries, or conditions." (Tr. 491.) Plaintiff's ex-husband therefore did not "state[] that [plaintiff] was able to use a computer, read, and complete puzzles." (Tr. 16.) Instead, he expressed no clear view as to her then-present ability to undertake these activities; he said only that she used to undertake them but no longer did.

Further, plaintiff's June 2011 function report noted several limitations on her abilities to prepare meals, perform chores, shop, and use a computer. (*See* Tr. 476-84.) With

33

respect to cooking and meal preparation, the 2011 report stated that plaintiff was unable to "stand for a long time [or] hold [any]thing that weighs more than 10 [pounds]." (Tr. 478.) It also stated that plaintiff did household cleaning, but that this was "limited," (*id.*), and that plaintiff shopped for food and miscellaneous items "[a]t least once a week," but did so with her husband or son, who would help. (*Id.* at 479.) Finally, it described plaintiff's use of a computer as "very limited." (Tr. 480.)

The March 2011 function report also noted limitations. On its first page, it stated that plaintiff cannot lift objects or "hold [any]thing in [her] hand for too long." (Tr. 457.) It also stated that plaintiff cooked "complete meals [at] least once [per] week," but did not explain what those meals were or how she prepared them, and added that otherwise, plaintiff made sandwiches and "warm[ed] up . . . what [her] husband br[ought] home" using a microwave. (Tr. 459.) Further, like the June 2011 function report, the March 2011 function report indicated that plaintiff's ability to clean was limited in that she only performed "basic sweep[ing], mop[ping]" and dishwashing, but did not do "[t]horough house cleaning" and her husband and son helped with "laundry [and] heavy cleaning." (*Id.*)

Thus, "[t]he ALJ's reference to plaintiff's daily activities was selective in that it did not consider the limited

basis on which plaintiff performed these activities and, even
then, frequently with help." *Kuleszo v. Barnhart*, 232 F. Supp.
2d 44, 57 (W.D.N.Y. 2002). An ALJ, however, "cannot pick and
choose only that portion of the evidence that supports his
conclusions." *Id.* (citing *Morgan v. Chater*, 913 F. Supp. 184,
188 (W.D.N.Y. 1996)); *accord Fiorello v. Heckler*, 725 F.2d 174,
175–76 (2d Cir. 1983) (vacating and remanding ALJ decision where
ALJ "pick[ed] and cho[se] excerpts" from physicians' reports to
support his conclusion).

When considered fully and not selectively, the
function reports clearly indicate significant limitations on
plaintiff's ability to go about the activities of daily life.
The ALJ's finding that plaintiff's ability to engage in daily
life activities was not limited by carpal tunnel syndrome is
therefore flawed, and the function reports do not support the
conclusion that plaintiff's carpal tunnel syndrome is not
severe.

### b. Treatment Records

In addition to the function reports, the ALJ cited
several treatment records in support of his "conclusion that
[plaintiff's] carpal tunnel syndrome is not as severe as
alleged." (Tr. 16.) In particular, the ALJ cited treatment
records from Putnam Behavior Healthcare and noted that a
February 2011 entry "listed 'computer skills' amongst

[plaintiff's] abilities, suggesting she was able to use her hands at that time."  (*Id.* (citing Tr. 660).)  The ALJ also stated that the February 2011 Putnam Health document "noted [plaintiff's] mental and physical complaints, . . . but did not include carpal tunnel syndrome."  (*Id.*)  According to the ALJ, "this is similar to a 2006 hospital entry that noted complaints related to migraines and hypertension, but no carpal tunnel syndrome complaints."  (*Id.* (citing Tr. 576).)

In relying on the February 2011 Putnam Behavioral Healthcare report, the ALJ apparently ignored that a separate, contemporaneously generated Putnam Behavior Healthcare document expressly states that plaintiff "has . . . carpal tunnel in both hands."  (Tr. 711.)[10]  Additionally, the February 2011 Putnam Behavioral Healthcare document to which the ALJ cited focused on plaintiff's mental health.  The document begins with a space for the preparer to list the patient's placement on Axes I-IV (Tr. 658), which are components of the multiaxial assessment system set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of*

---

[10]    In the Putnam Behavioral Healthcare report to which the ALJ cited, the preparer made a marking indicating that "treatment is medically necessary because . . . [f]or children ages zero to eighteen, treatment is developmentally appropriate."  (Tr. 660.) Plaintiff was 49 years old at the time of the report's generation, and the preparer's marking therefore casts at least some doubt on the thoroughness and care with which the report was prepared.

*Mental Disorders*, Text Revision (4th ed., rev. 2000) ("DSM-IV"), at 27-36 (discussing multiaxial assessment system).

The February 2011 Putnam Behavioral Healthcare document also included checklists for the patient's "strengths" and "needs," and it is in this context that the document listed "computer skills" as an ability, after indicating on one of the checklists that plaintiff "[k]nows how to use a computer." (Tr. 659-660.) Put in proper context, the document's statement that plaintiff has "computer skills" noted that plaintiff possessed knowledge regarding computer operation, but did not state whether plaintiff could operate a computer without any physical difficulty.

Similarly, the 2006 treatment record that the ALJ interpreted as consistent with his selective assessment of plaintiff's February 2011 Putnam Behavioral Healthcare records indicated that plaintiff's "presenting problem" was a recent instance of self-harm and plaintiff's ensuing desire to seek help before it repeated. (Tr. 569.) The bulk of the document focused on plaintiff's mental status (*see* Tr. 569-77), and the document was prepared by a mental health professional, not a physician. (*See* Tr. 576 (listing preparing clinician's credentials as "MS LMH").) It is therefore far from clear that the omission of carpal tunnel syndrome, or any other physical impairment, from this record could properly be considered as

evidence that plaintiff's carpal tunnel syndrome did not limit her, particularly as she underwent carpal tunnel surgery two years *after* this record was generated. (Tr. 16.)

The ALJ also referred to "multiple entries from February, March and May 2012 [that] noted either no hand or carpal tunnel complaints, or described [plaintiff's] extremities as normal." (*Id.* (citing Tr. 719-20, 738).) These records are exceedingly difficult to read, and significant portions of the records are illegible. (*See* Tr. 719-21, 738.) This weighs in favor of remand. *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (concluding that remand was appropriate where material records were missing or illegible); *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) ("Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation." (citation omitted)).

Additionally, the legible content in the 2012 treatment records indicates flaws in the ALJ's interpretation of the records. Most notably, and contrary to the 2014 ALJ Decision's characterization, the February 2012 entry the ALJ cited both referenced "carpal tunnel syndrome" and indicated that plaintiff's extremities were abnormal. (Tr. 720.) Further, the remaining entries are records of office visits specifically related to back pain, not to carpal tunnel

syndrome.  (Tr. 719 (noting March 2012 visit was follow-up on
back pain), 738 (noting May 2012 visit was for a medication
refill for chronic back pain).)  The 2014 ALJ Decision did not
explain any basis for the ALJ's implicit assumption that
limitations resulting from carpal tunnel syndrome should be
reflected in treatment records related to back pain.

An analogous situation arose in *Rosa v. Callahan*, 168
F.3d 72 (2d Cir. 1999): the claimant's treating physician opined
that the claimant could not perform sedentary work, but the ALJ
"disregarded this finding . . . because the three remaining
doctors who had examined the claimant reached no such
conclusions."  168 F.3d at 81.  The Second Circuit concluded
that it was improper for an ALJ to rely on the remaining
physicians' omissions "as the primary evidence supporting [a]
denial of benefits" where the reports were "consistent with [the
ALJ's] conclusion . . . only to the extent that they were silent
on the [relevant] issue" and there was "no indication . . . that
the [physicians] intended anything by their silence or that they
set out to express an opinion" through their silence.  *Id.*
(internal quotation marks and citations omitted).

This situation is analogous because, to the extent the
2012 treatment records support the ALJ's step two determination
that plaintiff's carpal tunnel syndrome was not severe, they do
so "only to the extent that they [a]re silent on the issue."

*Id.* Further, there is no indication that the 2012 entries intended to convey any opinion regarding plaintiff's carpal tunnel syndrome by remaining silent, and an examining physician opined that plaintiff does suffer limitations as a result of carpal tunnel syndrome. (Tr. 16-17.) Accordingly, the 2012 entries cannot serve as the primary basis for a finding that plaintiff's carpal tunnel syndrome was not severe during the period in review, particularly because, as discussed below, the only evaluating physician to opine directly on plaintiff's carpal tunnel syndrome during the period in review concluded that it gave rise to significant limitations.

### c. *Remaining Evidence*

Based on the foregoing, only two pieces of evidence the ALJ cited at step two could actually, affirmatively support his determination at that step. Specifically, the ALJ cited a "2009 entry [that] noted normal extremity findings, including normal strength and range of motion . . . [and] a normal neurological exam." (Tr. 16 (citing Tr. 583-85).) Notably, this entry also indicates that plaintiff had surgical marks on both hands when examined. (Tr. 585.) As the ALJ acknowledged, plaintiff underwent carpal tunnel syndrome surgery in September 2008, and "testified that her symptoms have come back," implying that they went away for a time. (Tr. 16.) It is therefore

unremarkable, and consistent with plaintiff's testimony, that she would not have had symptoms in 2009.

Additionally, the ALJ cited a treatment entry that "noted [plaintiff] drove, cook, and cleaned for herself, which suggests far greater use of her hands than alleged."  (*Id.* (citing Tr. 716).)  Notably, however, this treatment entry appears to relate to mental health treatment as it discussed plaintiff's placement on Axes I-V and emotional well-being, (Tr. 714-16), and did not state whether and to what extent plaintiff's activities were limited.  As the court has observed, it can simultaneously be true that plaintiff drove, cooked, and cleaned, and that she was limited in doing so.

In addition to these pieces of evidence, in briefing the instant cross-motions, defendant notes that a January 2012 treatment record signed by Dr. Margaret Thorhallsdottir stated that plaintiff's bilateral wrist strength is "5/5," or full (Def. Repl. at 7 (citing Tr. 721)), although this same entry also indicated that plaintiff's extremities are "abnormal." (Tr. 721.)  Defendant also notes that a May 2012 report from Dr. Thorhallsdottir indicated that plaintiff's extremities are normal, (Def. Repl. at 7 (citing Tr. 738)), but plaintiff notes that this same report stated that plaintiff was unable to tie her own shoes.  (Pl. Supp. ¶ 163 (citing Tr. 738).) Additionally, Dr. Thorhallsdottir signed the February 2012

treatment entry referenced above, which stated both that plaintiff suffered from carpal tunnel syndrome and had abnormal extremities, (Tr. 720), and that both the January 2012 and May 2012 entries related to office visits for back pain.  (Tr. 721, 738.)

Defendant further notes that plaintiff worked in the kitchen and as an educational aide while incarcerated, (Def. Repl. at 7 (citing Tr. 129, 636-39)), but does not explain what plaintiff's work consisted of, or how that might relate to the severity of plaintiff's carpal tunnel syndrome.  Notably, plaintiff testified at the 2014 ALJ hearing that when she worked in the kitchen, she was "in charge of salads because [she] couldn't do the heavy lifting when it came to" heavier items, such as rice and beans.  (Tr. 129.)  Contrary to defendant's contention, the testimony defendant cites supports a conclusion that plaintiff's carpal tunnel syndrome significantly limited her ability to work with her hands.  Further, nothing in the record indicates what plaintiff's work as an "educational aide" consisted of or what its exertional demands were.

Finally, defendant notes that plaintiff "was able to neatly handwrite her own lengthy function reports."  (Def. Repl. at 7 (citing Tr. 435-37, 457-64).)  Defendant does not, however, point to any evidence regarding the time it took plaintiff to prepare her function reports, or any difficulty that plaintiff

may have encountered in preparing them.  Thus, all that the function reports establish is that plaintiff is able to use her left, dominant hand to some degree, but this is not in dispute.

On the other hand, the record contains significant evidence suggesting that plaintiff had severe carpal tunnel syndrome during the period in review.  It is undisputed that plaintiff was diagnosed with carpal tunnel syndrome in 1997 and underwent surgery for it in 2008.  (Tr. 16.)  Further, as the ALJ acknowledged in his step two analysis, plaintiff testified at the 2014 hearing before the ALJ that her symptoms were returning and she had difficulty lifting and holding onto objects.  (Tr. 16; *see also* Tr. 115-17 (transcript of 2014 hearing containing plaintiff's testimony regarding carpal tunnel syndrome).)  At the same hearing, plaintiff's son testified that plaintiff does not cook because she drops things.  (Tr. 16; *see also* Tr. 125-28 (containing son's testimony from same hearing).)

Additionally, as the ALJ noted in the 2014 ALJ Decision, Dr. Mehrotra, a consulting physician, addressed plaintiff's carpal tunnel syndrome in a report dated May 2, 2011 based on an April 18, 2011 disability evaluation.  (Tr. 16 (citing Tr. 669-674).)  In his report, Dr. Mehrotra wrote that plaintiff had a "history of carpal tunnel syndrome," and that "surgery was performed on the left hand, but unfortunately, the outcome was not satisfactory."  (Tr. 669.)  Dr. Mehrotra also

noted that plaintiff had begun to have symptoms in her right hand as well, and that "[i]t is becoming more difficult for [plaintiff] to hold things; she often drops things." (*Id.*) Further, he described plaintiff's grip strength as "very poor" (*id.*), noted a "loss of dexterity and painful wrist movements" in plaintiff's left hand (Tr. 671), and diagnosed her with carpal tunnel syndrome of the left hand. (*Id.*)

Notably, although the ALJ based his determination that plaintiff's carpal tunnel syndrome was not severe in part on his mistaken understanding that plaintiff's right hand was her dominant hand (Tr. 16), plaintiff has consistently stated that she is left handed, her ex-husband confirmed this in a third-party function report, and the 2012 ALJ Decision stated that plaintiff is left handed. (*See* Tr. 435 (Florida Department of Health Supplemental Pain Questionnaire dated March 3, 2011 including statement by plaintiff that she is left handed), 462 (function report dated March 3, 2011 indicating that plaintiff is left handed), 481 (function report dated June 21, 2011 indicating plaintiff is left handed), 492 (third party function report by ex-husband dated June 26, 2011 indicating plaintiff is left handed), 231 (portion of 2012 ALJ Decision observing that plaintiff is left handed); *but see* Tr. 798 (March 2012 Azalea Health record stating plaintiff is right handed), 812 (October 2012 Azalea Health record stating plaintiff is right handed).)

Dr. Mehrotra's evaluation, if credited, and if plaintiff is left handed, would therefore establish that plaintiff had significant difficulty using her dominant hand in a sustained and/or coordinated manner as a result of her carpal tunnel syndrome. This, in turn, would establish that plaintiff's carpal tunnel syndrome rose above a *de minimis* level and, consequently, was severe for purposes of step two of the five-step sequential analysis. *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) ("[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." (citing *Dixon*, 54 F.3d at 1030)).

Further, the record of plaintiff's initial denial of benefits in 2011 indicates that Elaine Whitehead of the Social Security Administration reviewed plaintiff's records, including Dr. Mehrotra's evaluation. (Tr. 187-88.) On May 3, 2011, Ms. Whitehead concluded that plaintiff was "[l]imited in [her] upper extremities," as she had "left hand grip strength [of] 2.5 out of 5 with loss of dexterity and painful wrist movements." (Tr. 187.)

Similarly, the record of plaintiff's denial of benefits on reconsideration, also in 2011, indicates that Jorge Pena, Ph.D. reviewed plaintiff's records. (*See* Tr. 196-97.) Dr. Pena concluded, in relevant part, that her reported

activities of daily living "appear[ed] to be credible in the
context of information provided by independent evaluators," and
that plaintiff suffered from "chronic pain," had "trouble
holding things," and had carpal tunnel syndrome in both hands.
(Tr. 196-97.)  Additionally, Dr. Pena wrote that plaintiff was
"able to fix complete meals and do basic household chores that
do not interfere with her physical problems" (Tr. 196), thus
indicating that plaintiff's physical problems did limit her
activities of daily living.

*d.  Summary*

In light of the foregoing record evidence, the court
disagrees with the ALJ's step two determination that plaintiff's
carpal tunnel syndrome is not supported by substantial evidence
in the record.  Dr. Mehrotra examined plaintiff and concluded
that her ability to use her left hand is significantly limited.
Ms. Whitehead and Dr. Pena found Dr. Mehrotra's analysis to be
sound in light of their review of plaintiff's remaining medical
records, and plaintiff, her ex-husband, and her son have
testified consistently that her carpal tunnel syndrome
materially limits her activities of daily living.

Additionally, although defendant correctly notes a
paucity of other records or evidence of treatment for carpal
tunnel syndrome during the relevant period (Def. Repl. at 5-6),
other courts have observed that it is "obvious . . . that 'just

because plaintiff's disability went untreated does not mean he [or she] was not disabled.'" *Gallishaw v. Comm'r of Soc. Sec.*, 296 F. Supp. 3d 484, 500 (E.D.N.Y. 2017) (quoting *Shaw*, 221 F.3d at 133). The instant action illustrates the obviousness of this proposition, as the record indicates that plaintiff lacked health insurance for at least a portion of the period in review, and even before that, financial difficulties precluded her from receiving basic treatment.

Specifically, a February 22, 2011 Psychiatric Evaluation identified "[l]ack of medical insurance" and "lack of access to healthcare" as among plaintiff's "Needs/Weaknesses." (Tr. 664, 690.) Additionally, in a document dated August 16, 2011, plaintiff stated that she "ha[d] no medical insurance to keep up with a doctor's care" and would lack insurance until at least January of 2012. (Tr. 503.) Earlier that year, on March 15, 2011 plaintiff told Dr. Umesh Mhatre, M.D., that she could not afford "even [a] five dollar[]" co-pay for blood work that would have been necessary for Dr. Mhatre to prescribe plaintiff a particular medication. (Tr. 706.) Similarly, Dr. Mehrotra reported that plaintiff had "been told that she has hypertension, but [wa]s not on any medication because she [could] not afford it." (Tr. 669.)

As the Second Circuit has observed, "[i]t would fly in the face of the plain purposes of the Social Security Act to

deny claimant benefits because he [or she] is too poor to obtain additional treatment." *Shaw*, 221 F.3d at 133. Instead, the lack of treatment should be "part of a more extensive inquiry into whether plaintiff was in fact disabled," *id.*, particularly where, as here, a consulting physician examined plaintiff and concluded that she suffered from carpal tunnel syndrome that limited her ability to function during the period in review.

Further, there is no direct evidence that, if credited, would affirmatively establish that plaintiff does not have greater than *de minimis* limitations as a result of her carpal tunnel syndrome. Instead, as discussed above, the ALJ reached this conclusion based on an impermissibly selective reading of function reports, and on a reading of treatment records that drew unsupported inferences. Moreover, based on the nature of the problems with the ALJ's evaluation, and the lack of any discussion of plaintiff's manipulative limitations in steps three through five of the five-step sequential evaluation, the court cannot conclude that the ALJ's error at step two was harmless. Accordingly, the court concludes that the ALJ committed error in finding plaintiff's carpal tunnel syndrome non-severe at step two, and this error warrants an order of remand.

### iii. *Dr. Mehrotra's Opinion*

Plaintiff contends that the ALJ erred in weighing Dr. Mehrotra's opinion. (Def. Mem. at 17-18.) The parties agree that Dr. Mehrotra is a consulting, rather than a treating, physician. (*See* Pl. Mem. at 9 (referring to Dr. Mehrotra's examination as "consultative"); Def. Repl. at 5 (same).) Although plaintiff asserts that the treating physician rule applies to consulting physicians, plaintiff is mistaken. *See* 20 C.F.R. § 404.1527(c)(2) (noting that treating sources, not consulting sources, are generally given more weight). Nevertheless, Dr. Mehrotra's opinion is a medical opinion and must be evaluated using the factors set forth at 20 C.F.R. § 404.1527(c)(1)-(6). 20 C.F.R. § 404.1527(c).

Here, the ALJ did not accord controlling weight to Dr. Mehrotra's opinion for largely the same reasons that he concluded plaintiff's carpal tunnel syndrome was not severe. Specifically, the ALJ concluded that Dr. Mehrotra's findings were inconsistent with daily activities reported in plaintiff and her ex-husband's function reports as well as with treatment entries from February, March, and May of 2012. (Tr. 16-17.) Additionally, the ALJ asserted that plaintiff was right hand dominant and thus took Dr. Mehrotra's diagnosis of carpal tunnel syndrome in plaintiff's left hand to be of limited significance. (Tr. 16.) Further, the ALJ concluded, without explanation, that

Dr. Mehrotra's "finding [wa]s not consistent with the finding of only 'some' tenderness of the wrist," or with plaintiff's "conservative treatment" during the period under review. (Tr. 16-17.)

As discussed above, however, the ALJ's evaluation of the function reports in the record was selective and therefore improper. Additionally, and also as discussed above, the treatment entry from February 2012 does not support the conclusions the ALJ drew from it, and the record indicates that plaintiff is left handed and, therefore, that Dr. Mehrotra's opinion regarding her left hand is highly significant. Further, the March and May 2012 treatment entries only support the ALJ's conclusions insofar as they are silent as to plaintiff's carpal tunnel syndrome, and there is no indication that the medical providers' records intend to convey anything regarding plaintiff's carpal tunnel syndrome by their silence.

The ALJ's remaining reasons for assigning Dr. Mehrotra's opinion little weight are no more compelling. The 2014 ALJ Decision does not explain why Dr. Mehrotra's conclusions that plaintiff's "left hand grip strength was 2.5 out of five with a loss of dexterity and painful wrist movements" and that plaintiff "retained normal grip strength in her right, dominant hand" are inconsistent with Dr. Mehrotra's "finding of only 'some' tenderness in the wrist." (Tr. 16-17.)

The court finds that these conclusions are not inconsistent. The conclusions regarding grip strength, movements, and dexterity relate to the function of plaintiff's hands and wrists, and the finding regarding tenderness relates to an ongoing sensation in plaintiff's wrist. These conclusions, therefore, relate to different aspects of plaintiff's physical condition. Moreover, the ALJ did not refer to, and defendant does not cite, any evidence that could support a finding that Dr. Mehrotra's conclusions are inconsistent. Consequently, the ALJ's finding is not supported by substantial evidence.

Nor does the "conservative" nature of plaintiff's treatment for carpal tunnel syndrome during the period under review, in and of itself, establish that plaintiff's carpal tunnel syndrome was not severe. Importantly, although the statement that plaintiff's carpal tunnel syndrome was treated conservatively "during the period under review" is factually correct, it is also misleading: plaintiff underwent surgery for her carpal tunnel syndrome in September 2008, no more than three months before the period in review. (Tr. 16.)

Further, the conservative nature of a treatment plan is not dispositive of the severity of a patient's condition. See Shaw, 221 F.3d at 134-35 (finding improper the district court's characterization of physician's recommendation of conservative treatment rather than "surgery or prescription

drugs" as "substantial evidence that [the claimant] was not physically disabled"). Instead, for the fact of a conservative course of treatment to support a conclusion that a claimant is not disabled, it must be "accompanied by other substantial evidence in the record, such as the opinions of other examining physicians" and objective findings. *Burgess*, 537 F.3d at 129 (citing *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995)).

Here, Dr. Mehrotra's opinion is the only examining physician opinion in the record that directly addresses plaintiff's carpal tunnel syndrome during the period in review. Additionally, the record leaves open the distinct possibility, not addressed by the ALJ, that plaintiff's treatment during the period in review was "conservative" because plaintiff had undergone surgery, a decidedly non-conservative treatment option, immediately prior to the period in review. The record also reveals the possibility, also not addressed by the ALJ, that plaintiff's financial circumstances and lack of health insurance influenced the nature of her treatment plan.

Accordingly, the court concludes that the reasons the ALJ gave for the weight he accorded Dr. Mehrotra's opinion are not supported by substantial evidence and are insufficient. Further, the ALJ's error in weighing Dr. Mehrotra's opinion cannot be considered harmless whether because the court has already concluded that the ALJ's overall step two finding is not

supported by substantial evidence, or because the ALJ proceeded
to step three of the five step sequential analysis.  Dr.
Mehrotra's opinion is highly relevant to plaintiff's functional
limitations, and consequently to the overall disability
determination.  The ALJ's error in weighing Dr. Mehrotra's
opinion therefore prejudiced the plaintiff at subsequent steps
of the ALJ's analysis, and is grounds for remand.

### 3.   RFC Analysis

Because the court has concluded that the ALJ committed
error in evaluating plaintiff's carpal tunnel syndrome at step
two, the court need not address plaintiff's contention that the
ALJ committed reversible error by failing to account for
plaintiff's manipulative limitations as part of his RFC
analysis.  The court notes, however, that "[t]he RFC assessment
must include a narrative discussion describing how the evidence
supports each conclusion, citing specific medical facts (e.g.,
laboratory findings) and nonmedical evidence (e.g., daily
activities, observations)."  SSR 96-8P, 1996 WL 374184, at *7.
Thus, even if on remand the ALJ concludes that plaintiff's
carpal tunnel syndrome is not severe, this conclusion will not
excuse a failure to address the impact of any limitations as
part of the RFC determination.

**B. Other Contentions Regarding RFC Determination**

       **1.   Migraine Headaches**

Plaintiff asserts that the ALJ's RFC analysis is flawed because the ALJ failed to consider plaintiff's severe migraines in his RFC analysis as required under applicable regulations. (Pl. Mem. at 15-16.) As plaintiff notes, at step two, the ALJ found plaintiff's migraines to constitute a severe impairment. (Tr. 15.) Additionally, plaintiff testified about her migraines and their effects at both the September 2012 and August 2014 hearings before the ALJ. At the 2012 hearing, plaintiff stated that she suffered at least "three [migraine] episodes . . . [per] month," each of which would "actually just knock [her] out." (Tr. 152.) Plaintiff further testified that each migraine episode lasted "[t]wo to three days," and that she dealt with them by "going to the emergency room for injections which w[ould] . . . put [her] to sleep" until the migraine subsided. (Tr. 153.)

At the 2014 hearing before the ALJ, plaintiff testified that she suffered headaches "[e]very other day," and "g[o]t a lot of migraines," which made her feel nauseous, unable to move, and "like the world is coming to an end." (Tr. 118-19.) Plaintiff further testified that, two years prior to the 2014 hearing, the headaches were "bad, really bad" and she had been prescribed two different medications for her migraines and

54

suggested that the migraines' effects made her unable to work. (Tr. 119.)

It is unclear from the record to what extent plaintiff's testimony regarding her symptoms described her symptoms during the period in review. To the extent it did not describe her symptoms during the period in review, the ALJ should have developed the record, at a minimum by questioning plaintiff regarding her symptoms during that period, and his failure to do so constitutes grounds for remand. Further, even assuming that plaintiff's testimony described her symptoms during the period in review, the discussion of those symptoms and their limiting effects in the 2014 ALJ Decision's RFC analysis is insufficient.

### i. *Sufficiency of Analysis*

Under applicable regulations, the Commissioner must assess the claimant's "residual functional capacity based on all the relevant evidence in the case record," 20 C.F.R. § 404.1545(a)(1), and must consider "*all* of [a claimant's] medically determinable impairments of which [the Commissioner] is aware." 20 C.F.R. § 404.1545(a)(2) (emphasis added). Consistent with these requirements, the SSA has made clear that "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and

other evidence."  SSR 96-8P, Titles II and XVI: Assessing

Residual Functional Capacity in Initial Claims, 1996 WL 374184,

at *7 (SSA July 2, 1996).

Here, the ALJ was clearly aware of plaintiff's

migraines, as he found them "severe" at step two (Tr. 15), and

plaintiff testified about her resulting symptom-related

functional limitations at two separate hearings before the ALJ.

(Tr. 118-19, 152-53.)  Further, plaintiff's reported limitations

are highly significant.  As discussed above, VE Dolan was

presented with two hypothetical individuals (Tr. 135-37), and

the ALJ concluded that plaintiff was more comparable to the

first than to the second.  (*Compare id. with* Tr. 26.)

At the 2014 hearing, however, plaintiff reported

suffering headaches "[e]very other day," and that these

headaches would make her "nauseous" and unable to move, (Tr.

118-19), and the second hypothetical individual presented to VE

Dolan was one who "would be expected to be off task during the

workday for approximately 20 percent of the workday . . . at

unpredictable intervals."  (Tr. 137.)  Thus, if plaintiff's

reported limitations were found to exist during the period in

review, plaintiff would be more comparable to the second

hypothetical individual, who VE Dolan testified could not

"sustain any competitive work activity."  (Tr. 137.)

Additionally, in 2012, plaintiff reported suffering "at least" three migraines per month and stated that each would render her unable to function for "[t]wo to three days." (Tr. 152-53.) VE Dolan testified that "at unskilled work activity," the category of work applicable to plaintiff, missing more than one day of work per month "seriously erodes the numbers which eliminates jobs." (Tr. 137-38.) Thus, if plaintiff's limitations as she reported them in 2012 were found to exist, VE Dolan's testimony would at least strongly suggest that plaintiff cannot transition to other work that exists in the national economy.

Despite the ALJ's determination that plaintiff's migraines were "severe" and the significance of plaintiff's reported limitations due to migraines, the 2014 ALJ Decision's RFC analysis contains only a single paragraph regarding plaintiff's migraines. (*See* Tr. 20-25 (setting forth RFC analysis).) In this paragraph, the 2014 ALJ decision summarizes plaintiff's testimony regarding the frequency, effects, and treatment of her migraines at the 2014 hearing, but elaborates no further.[11] (*See* Tr. 21.)

---

[11]     Specifically, the 2014 ALJ Decision states that
[plaintiff] testified that she experiences severe migraines [and] estimated that she experiences migraines every other day. [Plaintiff] described the condition as unchanged from the period prior to the date last insured. [Plaintiff] testified that during migraines she feels like her "world is coming to an end." Asked about treatment, [Plaintiff] testified that she was taking two medications at that time for her migraines.

Further, the discussion in the RFC analysis is directed to plaintiff's ability to perform light exertional work, particularly given the condition of her spine, (Tr. 22), as well as plaintiff's capacity to perform simple tasks and ability to interact with others in social and work settings. (Tr. 23-24.)  Nowhere in this discussion does the 2014 ALJ Decision clearly state any basis to conclude that plaintiff's migraines do not impact these abilities or capacities, or even acknowledge the potential limiting impact that plaintiff's alleged symptoms could have.

Thus, even though, in concluding that the first hypothetical individual presented to VE Dolan was the appropriate comparator for plaintiff, the ALJ necessarily declined to credit plaintiff's testimony regarding her symptom-related limitations, the ALJ did not explain the basis for this decision.  This absence of explanation alone establishes that the ALJ did not comply with SSR 96-8p's requirement that the RFC assessment "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." 1996 WL 374184, at *7.

---

Moreover, due to the lack of explanation for the ALJ's decision not to credit plaintiff's testimony regarding the limiting effects of her migraines, the court is left without any basis upon which to evaluate whether substantial evidence supports the ALJ's determination. The Second Circuit has observed that "[r]emand is particularly appropriate" where a reviewing court is "'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.'" *Pratts*, 94 F.3d at 39 (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). The ALJ's decision presents precisely such a situation.

Further, defendant's arguments regarding the 2014 ALJ Decision are flawed and beside the point. Defendant correctly notes that "[p]laintiff bears the burden of proof at the first four steps of the sequential analysis," and accordingly must affirmatively establish "the severity and effects of any impairment." (Def. Repl. at 2.) Defendant asserts that "[p]laintiff cites no medical evidence that would suggest that her alleged limitations caused by her migraines were greater than what the ALJ found" (*id.* at 2-3), and therefore failed to meet her burden.

Defendant's argument ignores that plaintiff submitted medical evidence that was sufficient for the ALJ to conclude

that plaintiff's migraines were severe at step two (Tr. 15), and that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" in the RFC analysis. (Tr. 21.) Moreover, defendant's argument regarding the substance of evidence does not account for the 2014 ALJ Decision's procedural flaw: its failure to make any findings regarding the limiting effects of migraines, much less provide any "discussion" that takes into account medical evidence as applicable regulations require.

In other words, the problem with the 2014 ALJ Decision is not merely that substantial evidence does not support the RFC determination. Instead, the additional problem is that the 2014 ALJ Decision's discussion of plaintiff's migraines in its RFC analysis is so sparse as to make it impossible for the court to determine whether substantial evidence supports the ALJ's determination. Accordingly, the court concludes that the ALJ committed error by failing to address plaintiff's alleged migraines and related functional limitations in the 2014 ALJ Decision's RFC analysis, and that remand is appropriate.

### ii. Sufficiency of Record Development

Due to the paucity of discussion regarding plaintiff's migraines in the RFC analysis, the court cannot discern from the 2014 ALJ Decision whether further record development was necessary with respect to plaintiff's migraine headaches. For

instance, the record contains no indication that the ALJ inquired as to any factors that may have precipitated and/or aggravated plaintiff's migraines, or regarding the effectiveness of the medications plaintiff was taking in response to her debilitating migraines.

As discussed above, the ALJ has an affirmative duty to develop the record. To discharge this duty, the ALJ must, in relevant part, "obtain a claimant's medical records and reports," and "question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Cruz v. Astrue*, 941 F. Supp. 2d 483, 495 (S.D.N.Y. 2013) (citations omitted).[12] Thus, on remand, the ALJ should take care to ensure that the record as it relates to plaintiff's migraines is sufficiently developed.

### 2. Mental RFC

Plaintiff also asserts that the ALJ committed reversible error in analyzing Ms. Davila's mental RFC because, in sum and substance, his determination regarding the limiting

---

[12] *Cruz* relied in part on the former 20 C.F.R. § 404.1512(d), which governed the ALJ's duty to obtain medical records, but has since been eliminated. Although the court does not here determine which version of applicable regulations defines the specific contours of the ALJ's obligations with respect to procurement of records, the court notes that by statute, and under the new 20 C.F.R. § 404.1512, the ALJ remains generally responsible for making at least some effort to obtain relevant medical records. *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(b).

effects of her mental health impairments is not supported by substantial evidence. (Pl. Mem. at 23-28.)

In his RFC analysis, the ALJ concluded that plaintiff was "limited to simple tasks with little variation and taking a short time to learn, up to and including 30 days." (Tr. 20, 23-24.) The ALJ further concluded that plaintiff was "able to deal with changes in a routine work setting" and "to relate adequately with co-workers and supervisors," but was "limited to work that requires only occasional contact with the general public." (*Id.*)

In reaching this conclusion, the ALJ relied on "multiple treatment forms from 2012 [that] checked off no evidence of suicidal ideation" (Tr. 22 (citing Tr. 760, 762, 764)),[13] "entries from 2011 describ[ing] plaintiff as not suicidal" (*id.* (citing Tr. 706, 708, 712)), and March and June 2011 psychiatric records assigning plaintiff a general assessment of functioning ("GAF") score of 60,[14] indicating

---

[13]    The ALJ also cited Exhibit B15F, page 4, which corresponds to page 751 of the Administrative Transcript. The relevant page does not "check[] off no evidence of suicidal thoughts" (Tr. 22), but the following page states that plaintiff "deni[ed] any suicidal ideation, . . . plan or intent" to a licensed mental health counselor in February 2012. (Tr. 751-52.)

[14]    "GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning." *Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citation omitted). "The GAF scale ranges from 0 to 100," *id.*, with a score of 100 representing "[s]uperior functioning in a wide range of activities" and an absence of symptoms, and 1 representing "[p]ersistent danger of severely hurting self or others," "persistent inability to maintain personal minimal hygiene," or "serious suicidal act with clear expectation of death." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision (4th ed., rev. 2000) at 34. Notably, the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* eliminated the use of the GAF scale. *Mainella v. Colvin*, No. 13-CV-2453(JG), 2014 WL 183957, at *5 (E.D.N.Y. Jan.

moderate symptoms or moderate difficulty in social or occupational functioning. (Tr. 23 (citing Tr. 682-83); *see also* DSM-IV at 34.)[15] The ALJ concluded that these entries were "consistent with the conclusion that [plaintiff] is not as impaired as alleged and could perform simple tasks." (*Id.*)

The ALJ also relied on a March 15, 2010 Florida Department of Corrections Individualized Service Plan Review that "noted [plaintiff's] adjustment [to prison] was good, that [plaintiff] continues to work as an educational aide which she enjoys, and assigned [plaintiff] a GAF of 70," indicating "mild, almost slight symptoms." (Tr. 23 (citing Tr. 637).) Additionally, the ALJ relied on an August 23, 2010 Florida Department of Corrections Individualized Service Plan Review document that "noted [plaintiff's] adjustment [to prison] was good [and] [plaintiff] continues to work in outside grounds which she likes" and assigned plaintiff a GAF score of 70, indicating mild symptoms, (*id.* (citing Tr. 636)), and another from March 16, 2011 that made "[s]imilar findings." (*Id.* (citing Tr. 635-37).)[16] The ALJ wrote that "such mild or normal

---

14, 2014).

[15] Pages 682 and 683 of the Administrative Transcript do not actually include any information regarding plaintiff's GAF scores. Plaintiff, however, does not dispute that she was assigned GAF scores of 60 in March and June of 2011, and cites to page 680 of the record, which indicates that Dr. Mhatre assigned plaintiff a GAF score of 60 on March 22, 2011. (Def. Mem. at 8 (citing Tr. 678, 680).)

[16] Notably, none of the pages of the Administrative Transcript to which the ALJ cited regarding the March 16, 2011 entry, nor any pages in their vicinity within the transcript, contain any records dated March 16, 2011, (see Tr. 630-50), although Florida Department of Corrections records dated June 15, July 17, and September 8, 2009 do contain broadly similar findings. (Tr. 638-42.) It is not clear whether the

findings, along with [plaintiff's] activity while incarcerated[,] support[] the conclusion that [plaintiff] could perform simple tasks."  (*Id.*)

Further, the ALJ cited a May 2009 Florida Department of Corrections Intake Psychological Screening document that described plaintiff's adaptive functioning as "only 'mildly' impaired" (*Id.* (citing Tr. 652)),[17] and a May 2009 Florida Department of Corrections Suicide Profile describing plaintiff's "mood and affect as being 'within normal limits.'"  (*Id.* (citing Tr. 654.)  The ALJ wrote that these records supported the conclusion that plaintiff "could deal with changes in a routine work setting" and that her "moderate limitations would not preclude [her] from performing simple tasks."  (*Id.*)  The 2014 ALJ Decision also stated that "[a] May 28, 2009 form checked off the claimant's affect and behavior as appropriate, her appearance as neat, and her immediate and remote memory as intact" (*id.*), but did not cite to any exhibit to support this proposition (*see id.*), and the court is unable to locate this document.

---

March 16, 2011 date, the citation to pages 635-37 of the transcript, or both represent typographical errors

[17]    The 2014 ALJ Decision appears to contain a typographical error in that it cites to page 73 of Exhibit B2F, which corresponds to page 651 of the Administrative Transcript and does not mention plaintiff's "adaptive functioning."  The following page, however, includes entries stating "Adaptive Behavior wit[h]in Normal Limits: Yes," and "Mildly Impaired Adaptive Functioning: No," and thus indicates that plaintiff's adaptive functioning was not impaired.  (Tr. 652.)

Additionally, the ALJ noted that plaintiff and her ex-husband's function reports both indicated that plaintiff "got along 'very well' with authority figures," had never lost a job due to difficulties getting along with others, and shopped with her ex-husband, suggesting that plaintiff "was able to interact with the public on at least a superficial basis, and maintain relationships and interact with those she knew in an appropriate fashion." (*Id.* (citing Tr. 476-84, 487-94).) Finally, the ALJ observed that a June 2011 Putnam Behavioral Healthcare Physician Progress Note described plaintiff as "pleasant and cooperative" (Tr. 24 (citing Tr. 678)), several other records from 2009 and 2011 described plaintiff as "cooperative," (*Id.* (citing Tr. 633, 699, 701, 705, 708)), and plaintiff worked as an aide while incarcerated. (*Id.*) According to the ALJ, these records "suggest[ed] that [plaintiff] could maintain socially appropriate contact with others for at least brief periods." (*Id.*)

### i. *GAF Scores*

Defendant asserts that the ALJ improperly ignored "nearly two dozen GAF scores in [plaintiff's] records that identify dramatic fluctuations in her mental health." (Def. Mem. at 24.) Upon a review of the ALJ decision and the record, however, the court can identify only three GAF scores assigned

to plaintiff during the period in review that the ALJ did not address in the 2014 ALJ Decision.

Specifically, the ALJ did not address a February 22, 2011 Putnam Behavioral Health Psychiatric Evaluation that assigned plaintiff a GAF score of 45 (Tr. 665), a February 9, 2011 Putnam Behavioral Healthcare Biopsychosocial Assessment that assigned plaintiff a GAF score of 55 (Tr. 713), or a March 1, 2011 Putnam Behavioral Healthcare Physician Progress Note that assigned plaintiff a GAF score of 50. (Tr. 668.) Scores of 45 and 50 indicate "serious symptoms" or "serious impairment in social [or] occupational . . . functioning," and a score of 55 indicates "moderate" symptoms or impairment in functioning. DSM-IV at 34.

Additionally, the ALJ considered, but assigned less weight to, a purported GAF score of 45 assigned in an August 6, 2011 Putnam Behavioral Healthcare report. (Tr. 23 (citing Tr. 509).) Although the ALJ assigned this report less weight based on his erroneous conclusion that it was outside the period in review (*id.*), the record does not actually include an August 6, 2011 Putnam Behavioral Health report,[18] and consequently the court has no basis upon which to evaluate the ALJ's treatment of such a report, if it exists.

---

[18] In referring to the August 6, 2011 report, the ALJ cited an August 2012 letter brief in support of plaintiff's disability claim, which mentioned the report and GAF score. (Tr. 23 (citing Tr. 509).)

Other than the February and March 2011 records, which were all produced within one week of each other, and the August 6, 2011 record, the GAF scores that defendant contends the ALJ improperly ignored are either outside the period in review or are equal to or higher than the 60, which the ALJ appeared to consider the operative score. (Tr. 23.) Specifically, plaintiff notes that she was assigned GAF scores as low as 25 and 30, but cites to a record from 2006. (Pl. Mem. at 25 (citing Tr. 576).) Plaintiff also refers to evaluations in May 2009 in which she was assigned GAF scores between 65 and 70, (*Id.* (citing Tr. 633, 652)), as well as several treatment entries from February through June of 2012, a period outside the period in review, each of which assigned plaintiff a GAF score of 55. (*Id.* at 26 (citing Tr. 685, 739, 745, 748, 762).)

In any event, as the Second Circuit has observed, several district courts in this circuit have "questioned" the proposition that "a GAF [score] generally provides a reliable basis for disability determinations." *Rock v. Colvin*, 628 F. App'x 1, 4 n.3 (2d Cir. 2015) (collecting cases). One such court noted, following the removal of the GAF scale from the *Diagnostic and Statistical Manual of Mental Disorders*, that the SSA issued a bulletin on July 31, 2013 observing that "there is no way to standardize measurement and evaluation" in generating GAF scores, and "the GAF score is not designed to predict

outcomes, and the scores are so general that they are not useful without additional supporting description and detail." *Mainella*, 2014 WL 183957, at *5 (citations omitted). In light of these problems, the SSA has "instruct[ed] ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used." *Id.* (citation omitted).[19]

Thus, GAF scores, standing alone, have limited evidentiary value. Further, even if the ALJ had considered the February and March 2011 GAF scores of 45, 55, and 50, higher GAF scores of 60 assigned in March 2011 and June 2011 suggest an improvement in plaintiff's condition during the period in review. It also bears mention that although the ALJ assigned a purported August 2011 score of 45 "less weight" based on his erroneous assumption that August 2011 fell outside the period in review, it is not clear that plaintiff was ever actually assigned this score.

---

[19]    The problems with, and SSA guidance regarding, GAF scores are also relevant to plaintiff's assertion that the March 2011 opinion resulting in a GAF score of 50 comes from a "treating source" and should be given "controlling weight." (Pl. Mem. at 26-27.)  If that opinion were given controlling weight, then its conclusions that plaintiff was responding well to medication, had no suicidal ideations, had fair judgment, and had a "guarded" prognosis would also be controlling. (Tr. 707-08.)  All of these conclusions support the ALJ's mental RFC determination.  In any event, because the March 2011 report was prepared by a nurse practitioner, it is not from an "acceptable medical source," and by definition cannot be from a "treating source". *See LaValley v. Colvin*, 672 F. App'x 129, 130 (2d Cir. 2017) ("Only 'acceptable medical sources' may be considered 'treating sources[,]' [and] [a] nurse practitioner is not an 'acceptable medical source.'" (citations omitted).)  Therefore, the March 2011 report is not entitled to controlling weight.

Moreover, the qualitative differences between the February and March 2011 GAF scores, which the ALJ did not consider, and the March and June 2011 scores of 60, which the ALJ did consider are significant. The differences, however, in and of themselves, are not so significant as to indicate that the ALJ's mental RFC determination was not supported by substantial evidence. Accordingly, the court looks to other evidence in the record to determine whether the ALJ's mental RFC determination is supported by substantial evidence.

### ii. Other Evidence

Plaintiff notes several documents in the record establishing her history of self-harm. (Pl. Mem. at 23 (citing Tr. 554, 567, 572, 633, 662, 688).) None of these documents, however, clearly establish that the ALJ erred in determining that plaintiff's suicidal ideations were not as severe as alleged during the period in review. More specifically, the first document plaintiff cites is an Emergency Screening Evaluation from plaintiff's admission to Meridian Behavioral Healthcare following a 2006 suicide attempt. (Tr. 549, 554.) Plaintiff also cites an Intake and Screening Evaluation from a separate Meridian Behavioral Healthcare admission in February 2006, which reported that plaintiff attempted suicide in 2006 and 2000 (Tr. 567, 572), as well as another instance of self-harm in 1999. (Tr. 572.) The ALJ expressly noted plaintiff's

October 2006 admission in the 2014 ALJ Decision (Tr. 23), before going on to discuss evidence that was more temporally proximate to the period in review and which supported the ALJ's mental RFC determination.  That the ALJ did not refer to the prior Meridian admission does not undermine this other evidence.

Additionally, plaintiff cites a 2009 Florida Department of Corrections Individualized Service Plan, which stated that plaintiff has undertaken "[n]umerous suicide attempts," but did not elaborate any further, including as to when those attempts occurred.  (Tr. 633.)  Notably, that same evaluation assigned plaintiff a GAF score of 70, and although the usefulness of GAF score is limited as discussed above, the DSM-IV states that a person with a score of 70 is "generally functioning pretty well," and indicates suicidal ideation or more severe suicidal tendencies are present only at scores of 50 and below.  *See* DSM-IV at 34.  The 2009 Florida Department of Corrections document therefore does not undermine the ALJ's mental RFC determination.

Finally, plaintiff cites a February 2011 Putnam Behavioral Healthcare evaluation, which noted to prior suicide attempts and other self-harm (Tr. 662, 688), but went on to expressly state that there was "no suicidal ideation" at the time of the evaluation.  (Tr. 664, 690.)  Like the 2009

Individualized Service Plan, this evidence does not undermine the ALJ's mental RFC determination.

The other evidence to which plaintiff cites is no more compelling. Plaintiff refers to agency consultants' determinations that plaintiff had "significant mental limits" and "sustained concentration and persistence limitations and social interaction limitations" (Pl. Mem. at 23-24 (citing Tr. 186, 201)), but these determinations are consistent with the ALJ's mental RFC determination, as the ALJ concluded that plaintiff is "limited to simple tasks" and "work that requires only occasional contact with the general public." (Tr. 20.)

Plaintiff also cites to statements in treatment entries that diagnosed plaintiff with a mental health disorder or spoke to her mental and/or emotional health more generally. For instance, plaintiff cites to Dr. Mehrotra's 2011 diagnosis of "bipolar disorder with suicidal tendencies and manic depression," (Pl. Mem. at 26 (citing Tr. 671)), and to 2011 statements by Dr. Mhatre that plaintiff was "depressed," her mood was "up and down," and her treatment response was "questionable." (*Id.* (citing Tr. 678, 680.) Notably, one entry that plaintiff cites stated that plaintiff's mood was only "mildly" depressed. (Tr. 680.) Moreover, these statements do not shed any light on the functional limitations plaintiff experienced as a result of her mental state.

As another court in this circuit has observed, "it is not the presence of . . . a medical condition, but rather its limitations, which inform the question of whether or not a plaintiff is under a disability." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 440 (N.D.N.Y. 2008) (citation omitted). Thus, plaintiff's citations to evidence establishing the presence of a condition or conditions, but not speaking to plaintiff's limitations as a result of that condition, do not undermine the ALJ's mental RFC determination.

Further, plaintiff asserts that her "good" adjustment to incarceration "does not support the ALJ's contention that she can perform simple, routine tasks in the outside world" because "individuals with mental impairments may function successfully in a restricted environment (such as a prison) but fail to deal effectively with the demands of getting to work regularly and receiving supervision." (Def. Mem. at 24.) Similarly, plaintiff asserts that her employment as an aide in prison "is not sufficient evidence regarding [her] ability to maintain relationships with others." (*Id.* at 24 n.13.)

Even accepting these contentions for the sake of argument, however, as the ALJ noted, plaintiff's own function report stated that she followed spoken instructions well, and got along with authority figures, "[f]or example, . . . bosses" "very well" and that she had never lost a job due to

difficulties getting along with others.  (Tr. 481-82.)
Plaintiff's ex-husband made substantially identical statements
in the third-party function report he completed.  (Tr. 492-93.)
The purported insufficiency of other evidence upon which the ALJ
relied does not detract from these statements in function
reports.  Additionally, the ALJ essentially concluded that
plaintiff's functioning was limited to somewhat "restricted"
environments by concluding that she was "limited to simple tasks
with little variation and taking only a short time to learn,"
and to "only occasional contact with the general public."  (Tr.
20.)

Finally, plaintiff cites her own testimony and
function report, and her ex-husband's statement in a function
report that plaintiff was often unable to get out of bed.  (Tr.
23 (citing Tr. 110-111, 457, 467, 487-88).)  Plaintiff does not
contend that the ALJ misconstrued these statements, only that
they weigh against his determination regarding plaintiff's
mental RFC.  She is correct that they support her position, and
not the ALJ's.  However, the question before the court is
whether the ALJ's determination finds support in substantial
evidence in the record.  The court concludes that it does, as
the evidence the ALJ cited as discussed above constitutes "such
relevant evidence as a reasonable mind might accept as adequate
to support" the ALJ's conclusion and "is more than a mere

scintilla." *Halloran* 362 F.3d at 31 (internal quotation marks and citation omitted).

## CONCLUSION

For the foregoing reasons, the court concludes that the ALJ committed error in determining that plaintiff's carpal tunnel syndrome was not severe at step two of the five-step sequential analysis, in giving Dr. Mehrotra's opinion "little weight" based on conclusions that are not supported by substantial evidence, and in evaluating the impact of plaintiff's migraines on her RFC. However, the court concludes that the ALJ did not err in evaluating plaintiff's mental RFC.

Accordingly, the court DENIES the Commissioner's motion for judgment on the pleadings, and GRANTS IN PART plaintiff's cross-motion to the extent that the 2014 ALJ Decision is VACATED and this action is REMANDED for further proceedings consistent with this Memorandum and Order. Specifically, on remand, the ALJ shall:

(1) Determine the severity of plaintiff's carpal tunnel syndrome giving full and fair consideration to all evidence in the record and developing the record, including by affirmatively seeking clarifying and/or additional information regarding plaintiff's carpal tunnel syndrome and resulting limitations, as necessary;

(2) To the extent necessary, develop the record regarding limitations resulting from plaintiff's migraine headaches, including by questioning plaintiff regarding the limiting effects of her migraine headaches during the period in review and by

74

affirmatively seeking clarifying and/or additional
information from medical and other sources;

(3) Consider all medically determinable impairments,
whether severe or non-severe, in analyzing plaintiff's
RFC, and provide an explanation if an impairment has
no impact on work as required by applicable
regulations and SSA guidance;

(4) Re-assess the weight accorded to Dr. Mehrotra's
opinion in light of the record as a whole and
utilizing the factors enumerated in 20 C.F.R. §
404.1527(c)(1)-(7);

(5) If a vocational expert is consulted, present a
hypothetical that includes all of plaintiff's relevant
limitations, determined in accordance with applicable
law and regulations and consistent with this
Memorandum and Order, and state with specificity the
basis for any reliance on the vocational expert's
opinion.

The Clerk of Court is respectfully directed to close

the case.

**SO ORDERED.**

Dated: Brooklyn, New York
      October 16, 2018

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York